Jo C. CALHOUN, Jr., and Esther C. Young, executors of the estate of Niels A. Christensen, deceased, Plaintiffs,

v.

The STATE CHEMICAL MANUFACTURING COMPANY, Defendant.

Civ. A. No. 30723.

United States District Court

N. D. Ohio, E. D.

June 5, 1957.

294

Albert R. Teare, Cleveland, Ohio, for plaintiff.

A. J. Hudson, Hudson, Boughton, Williams, David and Hoffman, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

This is an action for infringement of U. S. Letters Patent No. 2,180,795, brought by the Executors of the Estate of Niels A. Christensen, deceased. The defendant is an Ohio corporation with a regular and established place of business in this district. Jurisdiction and plaintiffs' right to sue are admitted.

The invention claimed by the patent in suit relates to the combination of a sealing member in the form of a resilient O-ring disposed in a groove in one of a pair of relatively reciprocating members for sealing co-action against the other member and wherein the axial length of the groove is related to the cross-sectional size of the compressed ring in a manner to provide a more effective sealing than theretofore had been possible.

The defendant sells a soap-dispensing device which utilizes the claimed combination and which is charged to infringe the patent. The manufacturer of the accused device is the Bobrick Manufacturing Company of Los Angeles, California. The Minnesota Rubber & Gasket Company of St. Louis Park, Minnesota supplies the O-rings to the Bobrick Manufacturing Company.

The defendant is merely a nominal party to this action, the real parties in interest being the Bobrick Manufacturing Company and the Minnesota Rubber & Gasket Company, each of which has agreed to reimburse and indemnify the nominal defendant against any loss which may be sustained as a result of this action.

The patent was issued November 2, 1939 to Niels A. Christensen, who died on October 5, 1952. Prior to the trial of this case the patent expired and by reason thereof plaintiffs have abandoned their prayer for injunction and seek only a decree for an accounting and costs.

The defendant has filed an Answer and Counterclaim in which it seeks a declaration of rights and injunctive relief. The defenses necessary to be considered are—non-infringement, invalidity of the patent, and the allegation in the Answer that:

"Defendant alleges, upon information and belief, that plaintiffs have come into Court with unclean hands, in that they have been and still are guilty of misuse of patent 2,180,795, by attempting, without sanction of law, to employ said patent to secure a limited monopoly of unpatented material, namely rubber O-rings, contrary to public policy and law, and in violation of the policy of the anti-trust laws."

The allegation of misuse of the patent is re-averred in defendant's counterclaim.

The patent covers five claims, but plaintiffs have elected to proceed on claim 5, which reads:

"The combination of a cylinder and piston, of a resilient elastic packing element therebetween having normally approximately circular cross-section, of a groove having a flat bottom portion spaced from the cylinder wall a distance less than the normal radial dimension of the ring, whereby when the ring is in the groove in operative position, it is compressed into somewhat ellipsoidal cross-section, and the width of the groove being greater than the axial dimension of said compressed ring by a fractional part of said axial dimension."

The crux of the invention as thus defined is the dimensional relationship between the components of the combination which specifies the width of the groove as greater than the axial dimension of the compressed ring by a fractional part of said axial dimension. More simply stated, the claim specifies the width of the groove to be less than twice the diameter of the compressed ring.

Prior to the invention claimed by the patent, the method of effectively sealing a reciprocating piston within a cylinder was largely confined to the use of chevron types of packing. This type of packing was effective in only one direction and necessarily had to be duplicated on both sides of the piston. The large number of parts in the assembly created difficulties in making adjustments of the packing to prevent leakage. Not the least of these difficulties was the necessity of removing the cylinder head in making such adjustments. Another objectionable feature of the old style packing was the friction that had to be overcome in starting the piston. Although O-rings had been used in sealing assemblies for many years, Christensen was the first to discover that they could be used as effective fluid seals in an assembly of a reciprocating piston in a cylinder. Shortly after the patent was granted the inventor disclosed it to aircraft manufacturers and to Government research engineers at Wright Field. The engineers were immediately impressed with the potentialities of the invention and its simplicity, but decided to subject it to tests before adopting it for use. Elaborate tests were made both in the laboratory and in the field by the Government and by private aircraft companies, particularly the Chance-Vought Aircraft Company. After thorough analyses of the tests, the Government was satisfied that the secret of the effective sealing accomplished by the invention was in the dimensional relationship between the groove and the ring as defined in the claims of the patent. The tests demonstrated that the use of the invention facilitated the starting of the piston, reduced the number of parts in the assembly, eliminated the need for adjustment, and effectively prevented leakage. It was demonstrated also that by the use of the invention the width and size of the assembly were reduced. Following this series of tests, the Government decided to use the invention in connection with the production of aircraft. In the interest of reducing the length of the piston and lessening the weight of the assembly, the Government standardized the dimensional relationship of the groove and the ring at 1.33, which was within the limits defined by the patent. In 1942 the Government entered into a nonexclusive license agreement with the patentee by the terms of which it agreed to pay a royalty of $75,000 for the use of the invention during the period of the national emergency. This license continued in effect until 1952. The Government did not renew the license after its termination, but apparently continued to use the invention, and there is now pending in the Court of Claims a suit by the plaintiffs against the Government for infringement of the patent.

The invention also went into widespread use in private industry. The evidence shows that between 1946 and 1956 the patentee and his successors in

interest received royalties from industrial users, computed on the basis of ¼ cent per unit, in the sum of $654,845.42. This is exclusive of the income received from the Government and represents royalties on 261,938,168 units.

■ The defendant contends that the combination covered by the patent does not rise to the dignity of invention but is merely a simple improvement obvious to a workman skilled in the art. Most inventions of simple design and conception appear obvious to any one after they are disclosed. But mere simplicity where viewed after disclosure does not necessarily negative invention. Application of Worrest, 40 C.C.P.A., Patents, 804, 201 F.2d 930; Patterson-Ballagh Corp. v. Moss, 9 Cir., 201 F.2d 403.

The question is whether a person skilled in the art, with the references of record before him, could, without the exercise of the inventive faculty, have conceived and made the combination. In re Goepfrich, 136 F.2d 918, 30 C.C.P.A., Patents, 1181.

The prior art patents cited by defendant may be disposed of with brief comment. Defendant relies upon four prior art patents as anticipations one of which, Frager No. 391,956, was cited by the Patent Examiner during the prosecution of the application for the patent in suit. It is the defendant's claim that in considering the Frager patent the Examiner took into account only the lower piston and ring of that invention and gave no consideration to an upper piston and ring included therein. Whether the Examiner neglected to consider the upper piston ring, it is clear that the dimensional relationship, which is the distinguishing characteristic of the patent in suit, was not suggested by the Frager patent. Defendant's expert admitted that the only dimensional relationship shown in Frager was one where the groove appeared to be two or more times wider than the ring. The Frager patent covered a piston type water meter having a slight differential in pressure and effected sealing by the use of rolling friction.

Plaintiffs' expert, Dr. Hoover, testified that the Frager seal "was not suitable for the type of pressure application that Christensen envisions and which his patent is used for." This witness also quoted from an opinion in the Kennedy paper of the Institute of Mechanical Engineers where, in commenting upon a piston type of water meter, the author said: "It may be observed that the rolling packing although admirably suited to the present purpose, would not be serviceable on a piston or plunger that had to meet much resistance."

I am not persuaded that the Patent Examiner was in error in rejecting Frager as an anticipation.

Another prior art patent relied on by defendant is Durdin No. 1,859,436. This patent is for a seal for rotating shafts. The dynamic seal in the assembly is a metal face-to-face seal. There is also a static seal consisting of an O-ring which is clamped tight to the rotating shaft. Defendant's expert conceded that any sealing effect between the ring and the shaft was due to the gripping action of the ring, and it is clear that the O-ring in the Durdin patent is a fixed or static seal and is in no way comparable to the dynamic seal of the patent in suit.

Defendant also cites two British patents, Nos. 433 and 10716. British patent No. 433 is entitled, "Improvement in Cocks and Valves." This patent covers ten or eleven different arrangements of valves and uses a rolling ring seal disposed in a relatively long groove. The drawings of this patent show the O-ring placed in the end nearest the pressure, whereas an O-ring designed to operate in a differential pressure assembly in the manner of the Christensen patent would move to the side of the groove adjacent the lowest pressure. As stated by the plaintiffs' expert witness, "You would never get the Christensen idea from reading this patent."

British patent No. 10716 is styled, "Improvements in or relating to ball valves for flushing or supplying cisterns and the like." It is clearly shown that the O-ring in this assembly is a bearing ring

designed to subdue noise consequent upon the filling of the cistern. It is described by the plaintiffs' expert as a "shock absorber" or a "silencer," and as not being a seal "in any sense of the word." Defendant's expert admitted that there was nothing in the specifications or description of this patent which defined any dimensional relationship between the ring and the groove and that from the drawing it appeared that the width of the groove was more than twice the diameter of the ring. It is apparent that this patent did not anticipate the patent in suit.

■■ Considering the state of the prior art at the time of the invention in suit, it would appear that Christensen's invention was not obvious and was the result of exceptional ingenuity beyond the mere skill of a workman familiar with the prior art. "Solving a problem in a practical manner not obvious to those skilled in the art constitutes invention." Johnson Co. v. Philad Co., 9 Cir., 96 F.2d 442.

It may be said here, as was said in Cugley v. Bundy Incubator Co., 6 Cir., 93 F.2d 932, 934:

"While the component elements of the method are old, it achieves such new and highly meritorious results that we conclude that it rises to the dignity of invention."

■ The statutory presumption of validity of the patent in suit is strengthened rather than weakened by the evidence. It is strengthened by evidence of the novelty and utility of the patented combination. It is strengthened further by the evidence showing the marked commercial success of the invention. This latter factor is entitled to substantial weight in determining whether an improvement amounts to invention. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721. It should be noted also that the invention introduced a new and revolutionary method of fluid sealing for use in reciprocating assemblies that very largely superseded the method of sealing by use of chevron packings. In Safety Car Heat-ing & Lighting Co. v. General Electric Co., 2 Cir., 155 F.2d 937, 939, the court said:

"Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after: and—perhaps most important of all—the extent to which it superseded what had gone before."

The defendant has not sustained the heavy burden resting upon it of showing that the patent is invalid.

■ A substantial part of the testimony of defendant's expert witness related to ex parte tests conducted during the pendency of this action. This expert was associated with the real defendant, the Minnesota Rubber & Gasket Company. His testimony in respect of the ex parte tests was designed to downgrade the invention; but, under the circumstances, it is entitled to little or no weight. The witness' attempt to disparage the invention was effectively negated by his admissions that the application of O-rings in the invention was "predominantly successful" and was "basically new" in 1941, when he became affiliated with the aircraft industry. These concessions of the witness make the statement of Learned Hand in Chadeloid Chemical Co. v. Wilson Remover Co., D.C., 220 F. 681, 682, affirmed, 2 Cir., 224 F. 481, peculiarly appropriate here. Judge Hand said:

"The defendant makes no effort to contradict this evidence [of commer-

cial success], so I must suppose that it is not possible to do so. Its sole reliance is upon some experiments conducted *ex parte* \* \* \*. Obviously such experiments count for nothing against the weight of the evidence which the trade here affords, and courts have always so understood. Rynear Co. v. Evans, C.C., 83 F. 696; Plunger Elevator Co. v. Standard [Plunger Elevator] Co., 1 Cir., 165 F. 906, 911; Bethlehem Steel Co. v. Niles[-Bement-Pond] Co., C.C., 166 F. 880. The value of an invention gets its safest test from what those think of it who are looking impartially for the best thing they can get for their purpose; when they have so decisively declared against the old forms and for the new, no trials on mice or selected panels count for anything whatever."

█ While the defendant puts the claim of infringement in issue by its Answer, it has offered no evidence in opposition to the plaintiffs' evidence which clearly shows infringement of the patent. The uncontradicted testimony of plaintiffs' expert demonstrated that every element and function of the invention was found in the accused device. Infringement is made out indisputably.

### Misuse

As already stated, the defendant in its Answer and Counterclaim has raised the issue of misuse of the patent, claiming that the plaintiffs attempted to secure a limited monopoly of unpatented O-rings contrary to public policy and in violation of the antitrust laws.

· In his opening statement counsel for the defendant said:

· · "Now, on the matter of this misuse of the patent, I am not going to press that too far; not because I don't believe, we believe in what I am saying, but simply we haven't the proof we would like to have in order to explain some of the things we say we know of which we haven't been able to prove."

Then, after describing certain licenses granted by the patentee to manufacturers of O-rings, counsel concluded the part of his opening statement relative to the claim of misuse, by saying:

"Now, as you may suspect, people who participated in that are not particularly anxious to testify about this kind of thing and *we haven't been able to get the kind of testimony we require*". (Emphasis supplied.)

· Notwithstanding defendant's attitude as expressed at the outset of the case, a substantial part of its brief is devoted to the argument that in granting licenses to O-ring manufacturers to make and sell an unpatented part of the invention, plaintiffs were misusing the patent.

Defendant offered no evidence in support of the alleged misuse of the patent, but relied solely upon the claim that "the very granting of such licenses constituted a misuse of the patent." Defendant cites cases dealing generally with the subject of misuse of the patent, but submits no pertinent or controlling authority.

█ In 1946 the patentee granted non-exclusive licenses in identical terms to five O-ring manufacturers. One of the manufacturers ceased doing business in 1947. In 1950 the licenses to the other four manufacturers were modified by supplemental agreements. Without intending to suggest that the original licenses of 1946 constituted a misuse, it is clear that inasmuch as the modified licenses of 1950 became effective almost three years prior to the filing of this action, the issue of misuse as raised here must be determined by reference to the terms and effects of the licenses of 1950. These licenses provide, among other things, that:

"Licensor hereby grants to licensee a non-exclusive license to make and sell throughout the United States packings for use in said packing construction described in said United States Letters Patent No. 2,180,795 as a part of, repair for, or replacement in devices in which

said packing construction is a part, and hereby licenses any purchaser from the licensee to use the packing so sold, in accordance with said patent."

Further provision is made therein that:

"There shall be paid to the licensor for each packing construction used in accordance with said patent, a royalty of one-fourth cent (¼¢) irrespective of size of such construction. The Licensee shall act as the agent of the Licensor in collection of such royalty, and shall make payments to the Licensor in the manner hereinafter set forth."

In addition, the licensees agreed to submit monthly statements to the licensor showing the volume of sales of "packings" and the names and addresses of the purchasers. It is to be noted that, coupled with the license to sell unpatented O-rings, is an authorization to the purchasers thereof to use the O-rings in accordance with the patent. It is to be noted also that provision is made in the licenses for the payment of a royalty of one-quarter cent for each "packing construction" and that the licensed manufacturers are appointed agents of the patentee to collect such royalties. The manifest purpose of these licenses was to enable the patentee to secure the payment of royalties from the vast number of industrial users of the "patented construction" who purchased O-rings from the licensees. Such purpose was entirely consistent with the patentee's rights under his grant. The procedure adopted obviated the necessity of the patentee's attempting the extremely difficult, if not impossible, task of dealing directly with a large number of users of the invention and achieved the lawful result of securing to the patentee that which was rightly due him from such users.

Defendant contends, however, that as a result of the licenses the licensed manufacturers of O-rings secured a partial monopoly on the sale of unpatented products. That this was not the intended effect of the arrangement is clear.

Whether such was the actual effect of the licenses may well be doubted. Even if the fact be otherwise, it is not claimed, nor can it be, that the patentee or his successors in interest secured any limited monopoly in O-rings. Plaintiffs did not use the monopoly of the patent as an economic weapon to suppress competition in unpatented materials or to derive profit from the sale of such materials, as was true in the cases cited and relied upon by defendant. Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363; Mercoid Corp. v. Mid-Continent Inn. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Philad Co. v. Lechler Laboratories, Inc., 2 Cir., 107 F.2d 747.

While the record does not show the number of O-ring manufacturers in this country, it is fairly to be inferred that there were many others in addition to the four mentioned above. The Minnesota Rubber & Gasket Company, the real defendant in this action, is a manufacturer of O-rings and operated under a license from plaintiffs similar to those granted to the other ring manufacturers. Indeed, it appears that during the pendency of this suit, the Minnesota Company was collecting royalties for the plaintiffs from twenty-six users of the patented combination to whom it had sold O-rings. The evidence does not show that the plaintiffs refused to grant similar licenses to other O-ring manufacturers; nor is there any evidence that plaintiffs exerted or imposed any unlawful restraint upon the users of the invention in the latter's purchases of the rings. Those who used the invention were free at all times to purchase rings from any source selected by them and to pay royalties directly to the patentee or to one of his agents from whom O-rings were purchased. The patentee and his successors in interest made no threats of legal action against O-ring manufacturers, nor did they file any suits for contributory infringement.

However, the plaintiffs did file suits against direct infringers, as is evidenced by this action, and by the action against the Government in the Court of Claims. Other direct infringement suits have been filed by the plaintiffs in this court against General Motors, Ford, Chrysler, International Harvester, and J. I. Case Company. The royalty specified in the licenses to the four O-ring manufacturers was identical with the royalties prescribed in licenses granted directly to users of the patented combination. Plaintiffs granted a license to the Sheaffer Pen Company which provided for the payment of a royalty of one-quarter cent per "packing construction." A license was granted to the Parker Appliance Company upon the same terms. The patentee also filed with the Patent Office a form of license which it was willing to grant all those who desired to make or sell the invention and the royalty stipulated therein was also one-quarter cent per "packing construction."

In American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, 212, the court said:

> "In determining when courts will interfere with the patentee's power to sue infringers (contributory or direct), it is necessary to take into consideration whether, as a practical matter, the exercise of the patent monopoly will result in a limited monopoly in an unpatented commodity, and whether the patentee seeks to derive his profits not from the invention itself but from the unpatented supplies used in the invention."

Upon the state of the record here it is plain that the patentee's course of conduct was uniformly directed to the single lawful objective of deriving profit solely from the invention and not from the exploitation of any unpatented part thereof. And, as indicated above, there is a complete absence of evidence tending to show that the patentee or plaintiffs acquired a limited monopoly in O-rings. Neither the patentee nor plaintiffs were engaged in the manufacture or sale of O-rings, and, so far as the record shows, they had no financial interest in any of the companies manufacturing or selling these items. Nor does the record show that the patentee or his successors in interest combined with others to impose any conditions or restrictions upon those who sold or purchased O-rings.

The paucity of evidence in the record does not warrant a finding that plaintiffs misused the patent. Further comment is perhaps unnecessary, but it seems appropriate to extend this opinion for the purpose of examining defendant's contention that Section 271(d) of Title 35 U.S.C.A. has no application under the facts of this case. Section 271 reads as follows:

> "§ 271. Infringement of patent
>
> "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
>
> "(b) Whoever actively induces infringement of a patent shall be liable as an infringer.
>
> "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
>
> "(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would

constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

Paragraph (a) is merely declaratory of existing law. Paragraphs (b) and (c) are new and important statutory definitions of contributory infringement. Paragraph (d) authorizes a patent owner to license or authorize another to perform acts which if done without the consent of the patentee would constitute contributory infringement. The general purpose of paragraphs (b), (c) and (d) is indicated by the title of the bill introduced in March, 1948, which, as amended in 1952, was enacted into law. The title of the bill reads:

"A bill to provide for the protection of patent rights where enforcement against direct infringers is impracticable, to define contributory infringement, and for other purposes."

See Commentary on the New Patent Act, by P. J. Federico (Examiner-in-Chief, United States Patent Office), Vol. 1, Title 35 U.S.C.A., p. 52.

The Reviser's Note following Section 271 reads in part as follows:

"Paragraphs (b) and (c) define and limit contributory infringement of a patent and paragraph (d) is ancillary to these paragraphs, see preliminary general description of bill. One who actively induces infringement as by aiding and abetting the same is liable as an infringer, and so is one who sells a component part of a patented invention or material or apparatus for use therein knowing the same to be especially made or especially adapted for use in the infringement of the patent except in the case of a staple article or commodity of commerce having other uses. A patentee is not deemed to have misused his patent solely by reason of doing anything authorized by the section."

■ A patent owner may invoke the provisions of Par. (d) in those cases where, except for his consent, the conduct of another in relation to the invention would constitute contributory infringement.

Defendant argues that Par. (d) has no application because the O-rings are staple articles of commerce suitable for substantial non-infringing uses, and, under Par. (c), a seller of such staples is exempt from liability as a contributory infringer, even though he knows such staple articles to be especially made or especially adapted for use in the infringement of a patent.

■ Assuming, but not deciding, that O-rings are staple articles of commerce, it does not follow that a seller of such articles would in no event be liable as a contributory infringer. As indicated by the Reviser's Note, contributory infringement is defined in both paragraphs (b) and (c). Although Par. (b) uses the term "infringer", and Par. (c) refers to a "contributory infringer", it is clear that each of those paragraphs defines a different type of contributory infringement. While Par. (c) exempts the seller of staple articles of commerce from liability for contributory infringement as therein defined, no such exemption from liability is granted to one who actively induces the infringement of a patent in connection with the sale of staple articles of commerce especially made or especially adapted for use in the infringement of a patent. The author of the commentary, supra, makes the following pertinent comment:

"Paragraphs (b) and (c) are independent as written but, in connection with the sale of such things as staple articles and commodities of commerce suitable for substantial noninfringing use, which fall within the specific exception of paragraph

**302**

(c), clearly something more than mere knowledge of an intended infringing use would have to be shown to make out a case of active inducement under paragraph (b)." Commentary, page 53; see also page 54.

 The defendant's contention that Par. (d) does not apply to the facts of this case rests on the presupposition that the O-ring manufacturers who were granted licenses did no more than sell staple articles of commerce with knowledge of their intended infringing use. The record does not support such an assumption. On the contrary, the fair implications of the evidence reflect an arrangement between the licensor and licensees by the terms of which the licenses were granted authority to actively induce their customers to use the invention. Under the express terms of the license agreements the licensees were appointed agents of the licensor to collect royalties from those who purchased O-rings for use in the patented combination. Provision was also made in these agreements for a license from the patentee directly to the purchasers of O-rings, authorizing the latter to use the invention. By virtue of these agreements the patent owner was able to collect substantial royalties from many users of the patented combination, and the licensees were authorized to perform acts which, except for the consent of the licensor, would have subjected them to liability for contributory infringement under Par. (b) of Section 271. It is unnecessary to determine whether the licensees did in fact actively induce their customers to use the invention. It is enough to say that it has not been shown that the plaintiffs misused the patent by granting the licenses in question. Although Section 271 was not in effect at the time the licenses were granted, it became effective on January 1, 1953, almost twelve months before this action was filed.

Plaintiffs' prayer for an accounting is granted. The Counterclaim of defendant is dismissed. A decree may be prepared in accordance with this opinion.