**OAK INDUSTRIES, INC. and International Telemeter Corporation, Plaintiffs,**

v.

**ZENITH ELECTRONICS CORPORATION, Defendant.**

**No. 84 C 3045.**

United States District Court, N.D. Illinois, E.D.

Nov. 8, 1989.

**1528**

James G. Hunter, Jr., David A. York, David S. Foster, Latham & Watkins, Chicago, Ill., for plaintiffs.

Richard C. Yarmuth, Kathleen L. Albrecht, Culp, Dwyer, Guterson & Grader, Seattle, Wash., for Intem. Telemeter Corp.

Michael Barclay, Stuart Lubitz, Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., John F. Flannery, Robert K. Schumacher, Fitch, Even, Tabin & Flannery, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs Oak Industries, Inc. and International Telemeter Corporation, licensee and owner, respectively, of U.S. Patent No. 3,333,198 (Mandell patent), brought this suit against defendant Zenith Electronics Corporation (Zenith) claiming active inducement and contributory infringement. The parties earlier filed motions for summary judgment on the issue of infringement which were denied. *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F.Supp. 988, 9 U.S.P.Q.2d 1138 (N.D.Ill.1988). We invited further briefing on the design and use of the alleged infringing devices so that we could properly consider the questions of contributory infringement, inducing infringement, and damages. We also asked the parties to discuss whether a simple design change by Zenith could avoid infringement. *Id.* at 996, 9 U.S.P.Q.2d at 1144–45. Defendant once again moves for summary judgment on the basis of non-infringement, as well as on the basis of no damages. Alternatively, Zenith asks this court to find that any damages which may be recoverable by the plaintiffs be limited to devices sold which actually infringed the Mandell patent. Plaintiffs oppose both motions and move for summary judgment on Zenith's claim of patent invalidity under 35 U.S.C. §§ 102, 103.[1] For the reasons hereinafter stated, we deny all motions, except defendant's motion to limit damages to those devices found to have actually infringed the Mandell patent.

## BACKGROUND

The Mandell patent was issued on July 24, 1967 and expired in 1984. The Mandell

---

1. The sections on anticipation and obviousness state in pertinent part:

35 U.S.C. § 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonble diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 103. Conditions of patentability; non-obvious subject matter

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

patent claimed a method for eliminating direct interference on community antenna television (CATV) systems. This interference is caused by the small time difference in reception between the cable signal and the over-the-air VHF broadcast signal, and occurs when the broadcast signal is strong.[2] Zenith produces devices called converters, which are capable of practicing the Mandell method, and sells such converters to cable operators. However, these converters also perform other functions such as expanding the number of channels that the subscriber may receive, providing subscribers with the ability to unscramble protected signals, thus allowing cable operators to scramble protected frequencies, and allowing cable operators to address and remotely control subscribers' programming.

Zenith converters apparently contain several electronic systems, such as a tuner, a detector, a decoder and a modulator. These systems are interconnected to perform multiple functions. In other words, the same circuitry that, for example, expands the number of channels that a subscriber may receive, also allows the subscriber to receive on cable an over-the-air VHF channel output on a channel not used by the over-the-air stations (such as channel 3 in Chicago). The use of the converter's electronic systems in this manner, when combined with the shielding inherent in the housing in the Zenith converters, allows subscribers—at least for the purposes of this motion—to directly infringe the Mandell method.

On July 6, 1987, Zenith petitioned the Patent and Trademark Office (PTO) for a reexamination of the Mandell patent, claiming invalidity. The PTO reconfirmed the validity of the patent and issued a reexamination certificate on August 23, 1988. To limit the remaining issues the parties stipulated that the prior art that was raised during the reexamination will not be used to attack the patent's validity. Consequently, the only prior art at issue concerns

several devices constructed by a group of CATV workers called the Seattle Group.

For the purposes of this motion plaintiffs concede that Merle Davis, Brad Harrison and James MacKenzie, members of the Seattle Group, conceived a method of eliminating the direct pickup interference with a coverter device which could be attached to subscribers' television sets. This work became known as the Manhattan Project. Davis constructed a single conversion device (Davis Do–All) in June 1965, which eliminated the direct pickup interference by converting and outputting CATV signals directly to channel 2 (a channel not used by the Seattle area over the air stations) while preventing interference by local over-the-air-signals. There were still some problems with the Davis Do–All method so, in July 1965, Davis retained one Dale Crowe to further develop an interference-eliminating device. During July and August, Crowe constructed and delivered a device which plaintiffs concede "was capable of performing all the steps of the Mandell method." This Crowe double-conversion device first used a variable converter to convert CATV input signals to an intermediate frequency (on the order of 40 megahertz). Then, using a fixed converter, Crowe converted the intermediate frequency signal to channel 3 (also an unused over-the-air channel).

Davis then discussed further work with a Don McGory and an Irwin Wagner of Mutual Electric Supply (a Seattle Group member). Mutual submitted plans, breadboarded some converter circuits, and issued its last report on November 22, 1965. The Seattle Group members also approached one Philip Hamlin concerning possible manufacture of interference-preventing devices.

During this time a technician in the Seattle Group, Jerry Brown, used two or three converters in 30 or 40 homes to troubleshoot possible interference problems. It is unclear if those converters were left at subscribers' homes overnight.

---

**2.** A description of the technology involved is set out in detail in our earlier opinion. *See Oak,*

697 F.Supp. at 989–91, 9 U.S.P.Q.2d at 1139–41.

Around August 1965 the Seattle Group also demonstrated the converters to some visitors.

For the purposes of this motion plaintiffs acknowledge that both the Davis and Crowe devices were completed prior to November 4, 1965, the date plaintiffs concede to be the conception date of the Mandell invention. The parties also agree that the Crowe converter anticipates Mandell and that Mandell would be obvious in light of the Davis Do–All. Thus, if these prior inventions were publicly known or used prior to November 4, Mandell would be invalid under either § 102(a) or § 103. Furthermore, if the Seattle Group did not abandon, suppress or conceal the inventions, we could find Mandell invalid under either § 102(g) or § 103. Consequently, we need only decide if the inventions were publicly known or used, or if they were abandoned, suppressed or concealed prior to November 4, 1965.

## DISCUSSION

### I. *Burden of Proof*

There is no dispute that plaintiffs bear the burden of establishing infringement by a preponderance of the evidence. The parties differ in their interpretation of the burden of proof concerning the question of patent invalidity.

### A. Patent Invalidity

■ A patent is presumed valid and the challenging party has the burden of establishing its invalidity by clear and convincing evidence. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050, 5 U.S.P.Q.2d 1434, 1438 (Fed.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Estate of Stoller v. Ford Motor Co.*, 711 F.Supp. 1451, 1454, 12 U.S.P.Q.2d 1197, 1200 (N.D.Ill.1989). This clear and convincing standard applies even though the prior art introduced in court was not considered by the PTO. *Uniroyal*, 837 F.2d at 1050, 5 U.S.P.Q.2d at 1438. Furthermore, this burden remains at all times on the party asserting invalidity, and never shifts. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360, 220 U.S.P.Q. 763, 771 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

### B. Abandonment, Suppression or Concealment

■ In spite of the fact that it carries the burden of proving patent invalidity, Zenith argues that once a challenger has shown a prior invention under § 102(g) the burden shifts to the proponent of the patent to show abandonment, concealment or suppression. While there is support for Zenith's position in case law, *see Norris Industries, Inc. v. Tappan Co.*, 599 F.2d 908, 910, 203 U.S.P.Q. 169, 170 (9th Cir. 1979); *Amerline Corp. v. Cosmo Plastics Co.*, 407 F.2d 666, 670, 161 U.S.P.Q. 6, 9 (7th Cir.1969); *Refac Electronics Corp. v. R.H. Macy, Inc.*, 9 U.S.P.Q.2d 1497, 1504, 1988 WL 93835 (D.N.J., Sept. 9, 1988), *aff'd*, 871 F.2d 1097 (Fed.Cir.1989) (unpublished opinion); *State Industries, Inc. v. Rheem Manufacturing Co.*, 223 U.S.P.Q. 305, 317, 1984 WL 1243 (M.D.Tenn.1984), *aff'd in part, rev'd in part*, 769 F.2d 762, 227 U.S.P.Q. 375 (Fed.Cir.1985), we believe those cases do not correctly express the law on this subject.[3]

---

3. The holding of burden-shifting in *Amerline* relied on *International Telephone Mfg. Co. v. Kellogg Switch Board & Supply Co.*, 171 F. 651 (7th Cir.1909). However, the party in *International Telephone* claimed that the *inventor* had abandoned or dedicated his invention and therefore his claim should be invalid. *Id.* at 656. Thus *International Telephone* did not interpret § 102(g), but § 102(c). Furthermore, *International Telephone* placed the burden of showing abandonment on the party challenging the patent's validity. Consequently, if that case has any application to the instant case, it would support plaintiffs' rather than defendant's position.

The two more recent district court cases, *Refac* and *State Industries*, rely on *Amerline* as well as interference cases. *See Refac*, 9 U.S.P.Q.2d at 1504; *State Industries*, 223 U.S.P.Q. at 317. These have no further precedential value because there is no presumption of validity in an interference proceeding (there is no patent). Finally, the *Norris* court cites no case law to support its position of burden-shifting. *See Norris*, 599 F.2d at 910, 203 U.S.P.Q. at 170.

In our opinion the correct statement of the law is that the party claiming anticipation [4] under § 102(g) must show by clear and convincing evidence prior invention *and* that the invention was not abandoned, suppressed or concealed. *Medtronic, Inc. v. Daig Corp.*, 611 F.Supp. 1498, 1508, 227 U.S.P.Q. 509, 514-15 (D.Minn.1985), *aff'd*, 789 F.2d 903, 229 U.S.P.Q. 664 (Fed.Cir.), *cert. denied*, 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986). *See E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1437, 7 U.S.P.Q.2d 1129, 1135 (Fed.Cir.) ("the requirement of proving no abandonment, suppression, or concealment does mollify somewhat the 'secret' nature of § 102(g) prior art"), *cert. denied*, — U.S. ——, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *International Glass Co. v. United States*, 408 F.2d 395, 403-04, 187 Ct.Cl. 376, 161 U.S.P.Q. 116 (1969) *(per curiam)* (adopting opinion of Davis, Comm'r, 159 U.S.P.Q. 434, 441); *Klein v. Cannondale Corp.*, 8 U.S.P.Q.2d 1500, 1506 (D.Conn., Aug. 26, 1988), *aff'd in part, vacated in part*, 884 F.2d 1399 (Fed. Cir.1989). We further believe that this standard necessarily follows from the rule that the burden of proving patent invalidity is at all times on the party challenging the patent, and never shifts.

## II. *Summary Judgment*

In a patent case, as in other cases, a party is entitled to summary judgment "where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Everpure, Inc. v. Cuno, Inc.*, 875 F.2d 300, 302, 10 U.S.P.Q.2d 1855, 1856 (Fed.Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Stoller*, 711 F.Supp. at 1454. The court resolves doubts as to whether a genuine issue of material

fact exists in favor of the non-moving party and must draw all reasonable inferences in that party's favor. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656, 229 U.S.P.Q. 992, 994 (Fed.Cir.1986); *Axia, Inc. v. Jarke Corp.*, 12 U.S.P.Q.2d 1049, 1051, 1989 WL 39722 (N.D.Ill.1989). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986) ("evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). However, the court must consider the substantive evidentiary burden when viewing the evidence. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513. Consequently, where, as here, the party challenging the validity of the patent has the burden of establishing invalidity by clear and convincing evidence, the court must determine whether, based on the evidence, a reasonable jury could find that the defendant clearly and convincingly proved the patent was invalid. *See id.* at 255-56, 106 S.Ct. at 2513-14; *Fromson v. Citiplate, Inc.*, 671 F.Supp. 195, 200, 5 U.S.P. Q.2d 1198, 1203 (E.D.N.Y.1987), *aff'd*, 886 F.2d 1300, 1302, 12 U.S.P.Q.2d 1299, 1301 (Fed.Cir.1989).

## III. *Alleged Prior Art*

Zenith points to a number of actions by the Seattle Group that would allow us to find that the Davis Do-All and/or the Crowe converter were prior art under either § 102(a) or § 102(g). Plaintiffs point to other facts which would support a finding that Seattle converters were not prior art.

### A. Continued Development

The evidence shows that in July or August 1965, after Crowe finished his work, Davis discussed further work with Don McGory and Irwin Wagner of Mutual Elec-

---

**4.** Prior art under § 102(g) can be used to prove obviousness under § 103. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1371 n. 1, 231 U.S.P.Q. 81, 84 n. 1 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Similarly, prior art under § 102(a) can be used for § 103 purposes. *See Ransburg Corp. v. Champion Spark Plug Co.*, No. 86 C 103, slip op. at 7, 1988 WL 67566 (N.D.Ill. June 20, 1988) (§ 103 suggests courts look to § 102 as

definition of prior art). *See also Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1538, 227 U.S.P.Q. 784, 785 (Fed.Cir.1985) (public use qualifies as prior art under § 103), *cert. denied*, 479 U.S. 819, 107 S.Ct. 80, 93 L.Ed.2d 35 (1986). Consequently, for this discussion, when we discuss anticipation of Mandell by the Crowe device under § 102, we also consider that Mandell would be obvious in light of the prior art that does not anticipate (*i.e.*, Davis Do-All).

tronic Supply (Davis dep. at 40–41, 111). One Carl Winge authorized Mutual to proceed with the converter development on October 12, 1965. On November 2, 1965, Winge approved plans which Mutual submitted (Winge dep. at 93–97; pl.exh. 6). During this time Wagner built breadboard circuits of converters (Davis dep. at 61–62, 117, 122). The last written progress report was dated November 22, 1965, and Davis stated that Wagner and Mutual ended project work not later than December 1965. *Id.* at 61. On September 27, 1965, Winge contacted an engineer named Lockwood to refine the Crowe device into a solid state version (Winge dep. 23, 38–39, 90–92). Lockwood apparently accomplished nothing and was paid in March 1966, although Winge recalled that Lockwood ended his efforts sometime earlier. *Id.* at 40, 92–93. Also in the fall of 1965, Davis contacted Hamlin about manufacturing converters (Davis dep. at 68–70). MacKenzie also contacted Hamlin, though both men were unsure of the approximate date (MacKenzie dep. at 34–35; 1972 Hamlin dep. at 504).

### B. Use in Subscribers' Homes

Brown stated that he used converters in 30 or 40 subscribers' homes for a four- to six-month period after those units were built (Brown dep. at 17–19). Because the Crowe converters were delivered in July and August of 1965 (Crowe dep. at 19; Davis dep. at 32–33), Davis claims this shows usage past the admitted November 4 Mandell conception date.

The evidence conflicts concerning whether Brown used both the Davis and the Crowe converters, or only the Davis device. Brown was shown a photograph of the Crowe device and stated that he had probably used it in the same manner as the Davis Do–All (Brown dep. at 18–19). On the other hand, Brown stated that he could not remember being given converters that he was told were different from the Davis Do–All. *Id.* at 19. MacKenzie thought Brown used some Crowe converters in sub-scribers' homes but wasn't really sure (MacKenzie dep. at 28). MacKenzie claims that Brown left converters in subscribers' homes overnight. *Id.* at 33–34. Brown, the technician, stated that he never left a converter at any location overnight, although his answer was somewhat equivocal (Brown dep. at 23). Brown did state that he used the converters in subscribers' homes as test devices to determine if interference was getting into the television set or into the cable signal itself. He would hook up a converter and see if this eliminated the interference. If the interference disappeared he knew that the cable signal was problem-free and then attempted certain adjustments.[5] *Id.* at 9–12, 16.

### C. Demonstration to Others

Brown stated that he demonstrated a converter for "two or three other gentlemen who were not from his company." *Id.* at 20–21. Davis further testified that he showed converters to "visiting dignitaries from out of town," including a Charlie Clements, who was installing cable systems in New York (Davis dep. at 41). Apparently Davis was referring to the testing and demonstration of the Crowe converter in August 1965. *See id.* at 36. However, Davis was unsure as to whether Clements had an ownership interest in the Seattle Group companies at the time of the demonstration, although Davis was sure that Clements worked closely with the Seattle Group. *Id.* at 67.

### D. Failure to File Patent Application

In August 1965 Winge consulted with a patent attorney, Christensen, about the possibility of patenting one of the devices (Christensen dep. at 4–8, 20; Winge dep. at 17–18, 63). This was the only contact between Seattle Group members and Christensen, and apparently Winge sent no documents to Christensen (Christensen dep. at 8–9, 19; Winge dep. at 64–65). According to Winge, he decided not to pursue patent-

---

**5.** Because the Davis device could be used for test purposes, as well as to eliminate interference, it became known as the Davis Do–All (Davis dep. at 15). The device also had the potential to provide service for more than 12 channels and thus serve the function of a channel-expander.

ing any further (Winge dep. at 65). Davis also stated that he, MacKenzie and Harrison, of Mutual Electric Supply, believed that the converters were not patentable (Davis dep. at 74). No patent application was ever filed by the Seattle Group members (Winge dep. at 65).

## IV. *Are Seattle Group Converters Prior Art?*

### A. Prior Invention Not Abandoned, Suppressed or Concealed—35 U.S.C. § 102(g)

 Although § 102(g) is normally an issue when the PTO determines priority in an interference proceeding, an alleged infringer may use § 102(g) as a defense in an infringement action where the earlier inventor never filed a patent application. *See International Glass*, 408 F.2d at 402–03, 159 U.S.P.Q. at 440. To qualify as prior art under § 102(g), a prior invention must be conceived and reduced to practice. Furthermore, the prior inventor must not have abandoned, suppressed or concealed the invention. *Id.* at 402, 159 U.S.P.Q. at 440; *Medtronic*, 611 F.Supp. at 1508–09, 227 U.S.P.Q. at 514–15; *State Industries*, 223 U.S.P.Q. at 317. There is no requirement under § 102(g) that the prior invention be known to the patentee or "to the art." *DuPont*, 849 F.2d at 1436–37, 7 U.S.P.Q.2d at 1134–35. *See also International Glass*, 408 F.2d at 402, 159 U.S.P.Q. at 440 (distinguishing § 102(g) requirements from § 102(a)). Plaintiffs have conceded that the Davis and Crowe devices were completed prior to the Mandell conception date. Thus they are prior inventions and we need only determine if a material issue of fact exists concerning abandonment, concealment or suppression.

 A court may find that an invention was abandoned, suppressed or concealed if within a reasonable time after the invention was reduced to practice the inventor took *no* steps to make the invention publicly known. Factors supporting a finding of abandonment, concealment or suppression include not filing a patent application, not publicly disseminating documents describing the invention, and not publicly using

the invention. *International Glass*, 408 F.2d at 403, 159 U.S.P.Q. at 441; *Medtronic*, 611 F.Supp. at 1509, 227 U.S.P.Q. at 515. Most important, however, a court's conclusion of abandonment, suppression or concealment depends on the total facts of each case. *DuPont*, 849 F.2d at 1436 n. 5, 7 U.S.P.Q.2d at 1134 n. 5; *Young v. Dworkin*, 489 F.2d 1277, 1280, 180 U.S.P.Q. 388, 391 (C.C.P.A.1974).

### 1. *Abandonment*

 Abandonment means that the original inventor has voluntarily terminated any effort to exploit the invention. *Allen v. Brady*, 508 F.2d 64, 67, 184 U.S.P.Q. 385, 386 (7th Cir.1974); *State Industries*, 223 U.S.P.Q. at 317; *Continental Copper & Steel Indus., Inc. v. New York Wire Co.*, 196 U.S.P.Q. 30, 36 (M.D. Pa.1976). However, in order to preclude a § 102(g) defense, abandonment must occur prior to the time of the second invention. *See Allen*, 508 F.2d at 67, 184 U.S.P.Q. at 386; *Del Mar Eng'g. Laboratories v. United States*, 524 F.2d 1178, 1184, 186 U.S.P.Q. 42, 47 (Ct.Cl.1975). Thus Zenith must show that the Seattle Group did not abandon their invention prior to November 4, 1965.

Zenith points to evidence showing further work by Wagner and a disclosure to Hamlin, as showing continued development after November 4. Defendant also claims that one or both of the devices were used in subscribers' homes for a four-to six-month period extending past November 4. Plaintiffs, on the other hand, claim that Wagner was only refining or improving Crowe's work, and further argue that as a matter of law any use in subscribers' homes terminated prior to November 4. Finally, plaintiffs contend that the Seattle Group's deliberate decision not to file a patent—based on the erroneous belief that the devices were unpatentable—is evidence of abandonment.

Although not filing a patent application within a reasonable time after reduction to practice may negate a § 102(g) defense, it is only one factor. It appears that not filing or delaying the filing of a patent application may support a conclusion of

suppression and concealment. *Paulik v. Rizkalla,* 760 F.2d 1270, 1273, 226 U.S.P.Q. 224, 226 (Fed.Cir.1985) (*en banc*). *See also id.* at 1274–75, 226 U.S.P.Q. at 226–27 (discussing prior cases). However, it is not clear that failure to file a patent application would show abandonment. In fact, there simply is no requirement to file a patent application if a party is not seeking protection of the patent laws. *See Dunlop Holdings Ltd. v. Ram Golf Corp.,* 524 F.2d 33, 37, 188 U.S.P.Q. 481, 484–85 (7th Cir.1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976). Other factors shed more light on the question of abandonment.

For example, there is ample evidence to show continued development by Wagner past November 4, 1965. In spite of this plaintiffs contend that Wagner's work only refined or improved on the Crowe device and thus did not excuse their failure to file a patent application. *See Lutzker v. Plet,* 843 F.2d 1364, 1367, 6 U.S.P.Q.2d 1370, 1372 (Fed.Cir.1988).[6] We do not believe *Lutzker* is applicable to our question of abandonment for two reasons: First, *Lutzker* concerned a junior party in an interference proceeding attempting to overcome an inference of concealment or suppression (not abandonment) by claiming he was perfecting his invention during the 51–month delay in filing an application. Second, Lutzker's activities were directed at commercialization and he made *no changes* in the construction of the apparatus during the 51–month delay. *Id.* at 1367–68, 6 U.S.P.Q.2d at 1372. However, Wagner's work clearly differs in degree from what was done in *Lutzker.*

Wagner experimented with a different intermediate frequency than that used in the Crowe device (400 megahertz versus approximately 40 megahertz). Furthermore, Davis stated that the Crowe device needed further shielding because there were problems if the device was placed right over the television's local oscillator (Davis dep. at 40). Although some of Wagner's work was aimed at the channel expander function, we believe that it is reasonable to infer that Wagner's job included perfecting and improving on Crowe's work. Moreover, it is undisputed that Wagner's work continued past November 4, 1965. Lockwood was also hired to refine the Crowe converter and it is reasonable to infer that by hiring Lockwood the Seattle Group was continuing development. On the other hand, even interpreting testimony most favorable to Zenith concerning any work by Hamlin, that testimony adds little to support the claim of continuing development by Hamlin.

We must also consider any use in subscribers' homes as evidence of non-abandonment. Plaintiffs argue that Zenith, as a party having the burden of proof, may only rely on the least advantageous time period—in this case four months of usage. *See Oka v. Youssefyeh,* 849 F.2d 581, 584, 7 U.S.P.Q.2d 1169, 1172 (Fed.Cir.1988) (*per curiam*). This argument, if applicable, is only relevant if the use period started in June 1965 with Davis Do–Alls, rather than July or August 1965 with Crowe converters. While Brown's testimony is not completely clear on the matter, on a motion for summary judgment we draw all inferences in favor of the non-moving party. Consequently, we believe it is reasonable to infer that Brown used Crowe converters as test devices in subscribers' homes. Since Crowe only delivered his first converters in mid-July, even four months of usage would put the use period past November 4.[7]

Looking at this evidence as a whole, taking all inferences in Zenith's favor, we be-

---

6. The full statement from *Lutzker* is that a delay in filing a patent application will not be excused where the *improvements and refinements* made are not disclosed in the final patent application. *Lutzker,* 843 F.2d at 1367, 6 U.S.P.Q.2d at 1372.

7. Thus we do not decide if the rule in *Oka,* which established a date of conception for an interference proceeding, also applies to show a date of non-abandonment in an infringement suit. *See also Haultain v. DeWindt,* 254 F.2d

141, 142, 117 U.S.P.Q. 278, 279 (C.C.P.A.1958) (inventor can establish date not earlier than last day of time period). At least one court has said that such a rule does not apply to proving such dates at trial. *See Friction Division Prods., Inc. v. E.I. DuPont de Nemours & Co.,* 693 F.Supp. 114, 119 n. 5, 8 U.S.P.Q.2d 1652, 1656 n. 5 (D.Del.1988), *aff'd,* 883 F.2d 1027, 12 U.S.P.Q.2d 1575 (Fed.Cir.1989) (unpublished opinion).

lieve the jury could find, by clear and convincing evidence, that the Seattle Group did not abandon their invention prior to November 4, 1965. The development work alone clearly shows no abandonment. Brown's use of the devices for test purposes supports this conclusion, while failure to file a patent application does not really shed much light on the abandonment question.

### 2. *Suppression and Concealment*

Courts decide on whether an inventor has suppressed or concealed an invention on the facts in each individual case. *See Paulik*, 760 F.2d at 1280, 226 U.S.P.Q. at 231 (Rich, J., concurring); *Young*, 489 F.2d at 1280, 180 U.S.P.Q. at 391. A decision on whether an inventor has suppressed or concealed an invention is a conclusion of law. *Paulik*, 760 F.2d at 1280, 226 U.S.P.Q. at 232 (Rich, J., concurring). Thus courts look to the policy behind § 102(g)—encouraging public disclosure of inventions—to determine suppression or concealment. *Del Mar*, 524 F.2d at 1184, 186 U.S.P.Q. at 47. We also note that courts have distinguished between deliberate concealment or suppression, and an inference of concealment or suppression based on an excessive delay in filing a patent application. *See Paulik*, 760 F.2d at 1273, 226 U.S.P.Q. at 226.

Zenith puts forward two arguments to show no suppression or concealment. First, Zenith contends that the converters were publicly used in subscribers' homes through November 4, 1965. Second, defendant claims that the converters were demonstrated to persons outside of the Seattle Group organization. Plaintiffs, however, argue that Brown's use of the converters in 30 or 40 homes does not show "steps ... taken to make the invention publicly known" because Brown tried not to explain information about the converters. Plaintiffs also argue, as above, that Brown's use did not extend past November 4, 1965. Plaintiffs also note that the Seattle Group referred to their project as the "Manhattan project" because of the need to keep the work secret. Finally, plaintiffs reiterate

that the Seattle Group never filed a patent application on any of their work.

### a. Deliberate Suppression or Concealment

Plaintiffs argue that by characterizing the development work as the "Manhattan project" the Seattle Group intended to suppress and conceal any invention. Zenith counters that the reason for secrecy concerned the channel expander function of the converters and not the direct pickup interference function. However, if an invention was kept secret, the reason for the secrecy is irrelevant. We believe that the Seattle Group's characterization of the development work as the "Manhattan project" is evidence of an intent to keep the work secret. However, we must look at other factors because keeping a project secret does not necessarily mean we must conclude that the work is concealed or suppressed. *See DuPont*, 849 F.2d at 1436 n. 5, 7 U.S.P.Q.2d at 1134 n. 5.

Although Zenith claims that Brown's use of the converters in 30 or 40 homes defeats a claim of concealment, plaintiffs argue that Brown's actions were irrelevant because he did not make the information about the invention known to others. We believe that in order to avoid a finding of suppression or concealment, Zenith need only show that the public enjoyed the use and benefits of the Seattle converters. *See Friction Division Prods., Inc. v. E.I. DuPont de Nemours & Co.*, 658 F.Supp. 998, 1013, 3 U.S.P.Q.2d 1775, 1786 (D.Del.1987), *aff'd*, 883 F.2d 1027 (Fed.Cir. 1989) (unpublished opinion). A non-informing public use, as opposed to a secret public use, will defeat a claim of concealment, at least where the public benefits. *See Dunlop*, 524 F.2d at 36–37, 188 U.S.P.Q. at 483–84; *Refac*, 9 U.S.P.Q.2d at 1505; *Friction Division*, 658 F.Supp. at 1014, 3 U.S.P.Q.2d at 1786.

We do not believe Brown's use of the converters as test devices rises to the level of public use or benefit necessary to defeat an allegation of concealment under § 102(g). The converters were not "freely accessible to the public at large," so potential competitors could not discover the in-

vention. *See Dunlop*, 524 F.2d at 37 & n. 13, 188 U.S.P.Q. at 484 & n. 13. Brown's use is also quite different from the sale of large quantities of products to the general public, which courts have found sufficient to show non-concealment and non-suppression. *See id.* at 35 & n. 6, 188 U.S.P.Q. at 483 & n. 6 (distribution of at least 12,000 golf balls); *Refac*, 9 U.S.P.Q.2d at 1505 (commercial sale and distribution of watches).

The only evidence of overnight use is from MacKenzie, and Brown contradicts that testimony. MacKenzie was not directly involved in placing the converters in homes and, consequently, we do not believe that a jury could find no suppression or concealment based on such evidence.

Zenith is on firmer ground, however, in arguing that the Seattle Group's demonstration to outsiders of the converters precludes a finding of deliberate suppression and concealment. Brown stated that he demonstrated a converter to two or three men who were not from his company. Davis also recalled showing converters to out-of-town visitors. Although plaintiffs argue that these gentlemen could have been from other Seattle Group companies, or could have been subject to secrecy obligations, on this summary judgment motion we must give Zenith the benefit of reasonable inferences. Consequently, we infer that these visitors were outside the Seattle Group and not subject to secrecy obligations. We also note that Davis identified one of the visitors as Charlie Clements from New York. Although Davis was unsure of Clements' relation to the Seattle Group companies, for this motion we must infer that Clements, too, was an outsider and under no obligation of secrecy. Taking into account the inferences we must make, we believe there is sufficient evidence in these demonstrations for a jury to conclude, by clear and convincing evidence,

that the Seattle Group did not intend to suppress or conceal the inventions.[8]

### b. Inference of Suppression and Concealment

■ While we do not believe that the Seattle Group's decision not to file a patent shows deliberate concealment or suppression, we must however determine if these same actions give rise to an inference of suppression and concealment. Delay in filing a patent application can give rise to an inference of suppression or concealment. *Paulik*, 760 F.2d at 1273, 226 U.S.P.Q. at 226. Most courts have questioned whether delay in filing was sufficient to infer suppression of concealment. *See Lutzker*, 843 F.2d at 1367, 6 U.S.P.Q.2d at 1371; *Paulik*, 760 F.2d at 1274–75, 226 U.S.P.Q. at 226–27 (discussing cases). Here, because no patent was filed, Zenith must rely on other actions to defeat an inference of suppression or concealment. *See Refac*, 9 U.S.P. Q.2d at 1506 n. 25. The other actions were the demonstrations of the converters to outsiders. These demonstrations took place in the summer and fall of 1965, within months of Davis and Crowe reducing their devices to practice. Such a short delay time, we believe, clearly and convincingly demonstrates that inferring suppression or concealment is not appropriate. *See Correge v. Murphy*, 705 F.2d 1326, 1330, 217 U.S.P.Q. 753, 756 (Fed.Cir.1983) ("No authority has held that a 7–month period is *per se* unreasonble between reduction to practice and making the invention publicly known"). *Ransburg*, slip op. at 10 ("No court has held that a one-year delay . . . constitutes suppression . . .").

### B. Seattle Group Invention Known or Used by Others Prior to November 4, 1965

■ Zenith also claims that the Davis or Crowe converters are prior art under § 102(a) because they were "known or used

---

8. *Carboline Co. v. Mobil Oil Co.*, 301 F.Supp. 141, 148, 163 U.S.P.Q. 273, 278–79 (N.D.Ill.1969), does not compel a different conclusion. In *Carboline*, an alleged prior inventor claimed to have disclosed his invention to 190 persons. The work was classified and none of the 190 persons testified at trial or was even named.

Here, the work was not classified and Davis named at least one person who saw a demonstration of the converters. We do not mean to imply that the deposition testimony available for this motion will allow Zenith to prevail at trial. As we see in *Carboline*, more may be necessary.

by others" prior to the date of conception of the Mandell method. Courts construe this phrase to mean that the public must have access to the knowledge of the prior art. *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 139, 231 U.S. P.Q. 644, 646–47, *amended*, 1 U.S.P.Q.2d 1209 (Fed.Cir.1986); *Ransburg*, slip op. at 8. While there is no *per se* rule on the number of persons who must have knowledge of, or who used the prior invention, it appears that more than just a few persons must know or use the invention for it to be publicly known. *See National Tractor Pullers Ass'n v. Watkins*, 205 U.S.P.Q. 892, 911 (N.D.Ill.1980). However, where those skilled in the relevant art know of or use an invention, courts may infer the knowledge will become known to a sufficient number of people to become "public." *Cf. Carella*, 804 F.2d at 139, 231 U.S.P.Q. at 646 (to qualify as printed publication under § 102(a) a party should show accessibility and availability to those skilled in the art); *Refac*, 9 U.S.P.Q.2d at 1504 (publication must be accessible to those skilled in the art). Furthermore, the court may find a public use where there is a "non-secret use of a claimed process in the usual course of producing articles for commercial purposes". *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1549, 220 U.S. P.Q. 303, 309 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Zenith argues that there was sufficient prior use or knowledge of the Davis or Crowe devices to qualify them as § 102(a) prior art because (1) converters were left in subscribers' homes overnight; (2) the converters were demonstrated to individuals other than those belonging to the Seattle Group; and (3) information on the converters was disclosed to Hamlin. Plaintiffs claim that none of these actions show public use or knowledge by clear and convincing evidence and reiterate that the Seattle Group called their development work the "Manhattan project" to hide the work from the public.

■ In section IV–A,2(a) *supra*, we stated that we did not believe the Mac-

Kenzie statements—which were contradicted by Brown—were sufficient to allow a jury to find no suppression or concealment under § 102(g) by clear and convincing evidence. The requirements of public disclosure are greater for § 102(a) prior art. Consequently, we do not believe Zenith has met its burden to show overnight use of the converters qualifies them as § 102(a) prior art. *See Carella*, 804 F.2d at 138, 231 U.S.P.Q. at 646 (oral testimony of prior use or knowledge to be closely scrutinized and regarded suspiciously).

We also discussed the evidence concerning the demonstration of converters to others in section IV–A,2(a). The testimony of Brown and Davis refers to their demonstrating the converters to several people, at least some of whom were very knowledgeable in the electronics field (Brown dep. at 21), as well as at least one engineer involved with cable systems (Davis dep. at 41, 67). For the purposes of this motion we must infer that the persons who saw the demonstration were skilled in the relevant art.

Davis also testified in the fall of 1965 that he explained to Hamlin how to make a converter. *Id.* at 68–70. Although Hamlin did not corroborate Davis' statements, neither did he contradict them. Plaintiffs argue that Hamlin never saw a converter prior to November 4, 1965 and, in any event, Hamlin, as a potential manufacturer, was under an obligation not to disclose confidential information.

While it is true that Davis could not recall if he showed Hamlin a converter, he stated that explaining how to make the device was sufficient to allow one to reproduce the converter. *Id.* at 69. MacKenzie, however, did not know when he contacted Hamlin and it is also unclear what information MacKenzie gave him (MacKenzie dep. at 34–36).

Overall, we believe a jury could find by clear and convincing evidence that information about the converters was publicly known prior to November 4. The testimony by Brown and Davis, together with reasonable inferences, supports this conclusion. We believe Davis' statements con-

cerning the disclosure to Hamlin provides additional support. While we do not believe MacKenzie's discussion with Hamlin was a sufficient disclosure for the purposes of § 102(a), the overall evidence supports Zenith's position. We also are not convinced that under the circumstances of Davis' disclosure to Hamlin, Washington state law would impose on Hamlin an obligation of secrecy, because we believe it is questionable as to whether the information given to Hamlin by Davis was confidential. Finally, we reiterate that although characterizing converter development work as the "Manhattan project" is evidence of secrecy, this cannot overcome other evidence of public disclosure. Zenith need only show that a genuine issue of material fact exists to defeat plaintiffs' motion. We believe Zenith has met its burden as stated in *Anderson.*

## V. *May Zenith be Liable for Infringement?*

### A. Prior Decision

Zenith earlier moved for summary judgment claiming that it was not liable for either inducing infringement or for contributory infringement. *See Oak,* 697 F.Supp. at 989, 9 U.S.P.Q.2d at 1139. We denied both motions because Zenith did not present sufficient evidence to show an absence of material fact concerning whether its converters were staple articles.[9] We also stated that where a seller of a non-staple article does not actively encourage direct infringement, the concept of active inducement would merge with contributory infringement. *Id.* at 994, 9 U.S.P.Q.2d at 1143. We did not hold, as Zenith now argues, that liability for active inducement under 35 U.S.C. § 271(b) could not be established if Zenith sold staple articles of commerce. In fact, we stated that "we cannot know if the sale amounts to active inducement ... without knowing precisely what is being sold and what alternate uses it may have." *Id.*

[19] Our prior analysis led to the crucial question: are Zenith's converters staples? For if they are, Zenith is not liable for contributory infringement. *See Calhoun v. State Chem. Mfg. Co.,* 153 F.Supp. 293, 301, 115 U.S.P.Q. 120, 126 (N.D.Ohio 1957); 35 U.S.C. § 271(b). To answer this question we must examine the converter Zenith sells. *See Hodosh v. Block Drug Co.,* 833 F.2d 1575, 1577, 4 U.S.P.Q.2d 1935, 1937 (Fed.Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988). For the purposes of this motion Zenith has agreed that its converters are capable of practicing the Mandell method. Although these converters also perform additional functions, we recognized the general rule that combining non-infringing functions in one device that is capable of practicing a patented method will not ordinarily result in the court finding that such device is a staple. *Oak,* 697 F.Supp. at 995, 9 U.S.P.Q.2d at 1143–44. If this were not the rule, a seller could avoid liability for contributory infringement of a method patent simply by adding other materials or functions. We do not believe that Congress intended that the seller could so easily avoid liability.

The difficulty arises here because Zenith's converters use the same parts to perform non-patented methods and to practice the Mandell method. Zenith claims that because of these physical limitations, infringement of the Mandell patent is inevitable. Thus we continue to believe that the proper test to determine if a device that can practice non-infringing methods, but allows practice of a patented method, is a staple, is that the practice of the patented method must be incidental and necessary due to technological limitations. *Id.* at 996, 9 U.S.P.Q.2d at 1145. If the practice of the patented method is incidental and necessary to the practice of the unpatented methods, the device is a staple and there can be no contributory infringement. If, on the other hand, the practice of the patented method is not necessary or incidental to the practice of the unpatented methods,

---

**9.** Like the Supreme Court, we use the term "staple" to refer to an article which is staple or has a substantial non-infringing use. *See Daw-* *son Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 186 n. 6, 100 S.Ct. 2601, 2608, n. 6, 65 L.Ed.2d 696, 206 U.S.P.Q. 385, 392 n. 6 (1980).

a jury could find that the device *as a whole* is not staple and the seller could be liable for contributory infringement. We now turn to the question of infringement.

### B. Direct Infringement

█ To reach the issue of contributory infringement or inducing infringement, plaintiffs must first show direct infringement. *Aro Mfg. Co. v. Convertible Top Co.*, 365 U.S. 336, 341, 81 S.Ct. 599, 602, 5 L.Ed.2d 592, 128 U.S.P.Q. 354, 357 (1961); *Everpure*, 875 F.2d at 302, 10 U.S.P.Q.2d at 1856 (Fed.Cir.1989). Thus, Zenith argues that summary judgment should be granted as plaintiffs have not set forth competent evidence of direct infringement. Plaintiffs argue that they introduced sufficient circumstantial evidence to show direct infringement. Plaintiffs point to testimony that the converters can infringe the Mandell method (Kelly dep. at 115–16; sup. Stern decl. at ¶¶ 38–40). Plaintiffs further point to a report by Zenith's expert, O.D. Page, giving his opinion as to the maximum number of converters which may have infringed the patent. *See* plaintiff's evidentiary submission, exh. B, "Mandell Patent Litigation," dated January 12, 1987, at 9–11. Finally, plaintiff's expert testified that carrying VHF channels "on/channel" (thus allowing infringement) was the prevailing industry practice (Stern decl. at ¶ 48).

Zenith argues that in cases where direct infringement has been inferred, the products sold were not staples and thus had no substantial non-infringing use. *See, e.g., Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 803 F.2d 1170, 1173–74, 231 U.S.P.Q. 297, 300 (Fed.Cir.1986); *EWP Corp. v. Reliance Universal, Inc.*, 221 U.S.P.Q. 542, 554 (S.D.Ohio 1983), *rev'd on other grounds*, 755 F.2d 898, 225 U.S.P.Q. 20 (Fed.Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). While plaintiffs may require more evidence to convince a jury of direct infringement, and to quantify damages if awarded, we believe plaintiffs have come forward with sufficient evidence to withstand a motion for summary judgment. Circumstantial evidence may be used to prove direct infringement. *Moleculon Research Corp. v. CBS*, 793 F.2d 1261, 1272, 229 U.S.P.Q. 805, 813 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). And this, together with reasonable inferences drawn in plaintiffs' favor, are sufficient to defeat this portion of Zenith's motion.

### C. Contributory Infringement

As we requested in our earlier opinion, the parties have submitted additional evidence to allow us to resolve the question of contributory infringement. Zenith claims that its converters use the circuitry to perform both non-infringing functions as well as the patented method. Thus, Zenith argues that any use of the patented method is both incidental and necessary to the performance of these other functions. Zenith also points out that the use of the non-infringing functions, such as channel expansion, cannot occur at the same time a converter practices the Mandell method, and thus Zenith's converters have substantial non-infringing uses. Plaintiffs argue that the practice of the Mandell method is neither necessary nor incidental to the other uses of the converters because simple design changes in converters could prevent infringement.

#### 1. *Is Shielding Necessary to Practice Non–Patented Methods?*

We look at Zenith's converters as a whole. These converters contain tuners, detectors, decoders and modulators to change signal frequency, remove signals from the carrier wave, descramble the signal, address the signal, and place the signal on a new carrier having the frequency of a non-interfering channel. However, they also contain structural housings for some of the components as well as for the whole system. These structural housings provide support for the electronic components and shield electromagnetic radiation from leaving and entering the converters and the components. Zenith argues that the shielding is necessary to comply with the Federal Communication Commission (FCC) requirements to reduce the electromagnetic emissions from the converters (sup. Stern decl. at ¶ 8); to prevent interference from other sources such as power lines, citizen band

radios and police radios (4th sup. Kelly decl. at ¶¶ 4–5); to shield the different tuner stages from each other (*id.* at ¶ 6); and to provide a strong structural housing for sensitive electronic components (*id.* at ¶¶ 7–8). Plaintiffs disagree and claim that the degree of shielding used by Zenith is not necessary to perform the non-patented methods, but is necessary only if one wishes to practice the Mandell method (sup. Stern decl. at ¶¶ 8, 10, 12). Plaintiffs point out that Zenith tuners which do not eliminate direct pickup interference have less shielding (*id.* at ¶ 11; *compare id.* at exh. A (converter at issue) with *id.* at exh. B (converter which does not eliminate direct pickup interference.))

We believe that there is a genuine issue of material fact that precludes granting Zenith summary judgment. A jury could find that the design of the converters at issue, specifically the amount of shielding used for the tuners and boxes, was not necessary to perform all the unpatented functions and that practice of the Mandell method was not incidental to other uses of these converters. Thus a jury could find that the converters as a whole were not staple articles suitable for substantial non-infringing uses.

We believe this reasoning is consistent with the legislative history and policy behind 35 U.S.C. § 271(c). If Zenith sold electronic components, and someone else assembled them and infringed the Mandell claim, Zenith would not be liable for contributory infringement. Those electronic components are of course staples. If Zenith sold converters that allow channel expansion, unscrambling, remote control and other functions, but did not include an element for "preventing radiation from [the] local transmitter from interfering with [the] signals received over [the] coaxial cable," *see Oak,* 697 F.Supp. at 990, 9 U.S.P.Q.2d at 1193 (Mandell claim), Zenith would not be liable for contributory infringement. Those converters, without radiation shielding, would have substantial non-infringing use even though they could be used to infringe the Mandell patent if additional shielding was added by others.

We believe, however, that if Zenith adds the radiation shielding that is not necessary to the non-infringing functions of the converters, these shielded converters cease to be staples. In such a case, the new shielded converters have no reason for being other than to infringe the Mandell patent. The non-infringing uses are economically driven because the extra infringing function has now been added. The converters with extra shielding perform no additional non-infringing functions from the unshielded converters. If on the other hand the converters only contain shielding required to perform the non-infringing functions, they remain staples.

Holding Zenith liable for contributory infringement for selling converters with extra shielding would not impermissibly extend plaintiff's patent grant. Zenith would be free to sell converters that perform all of the present functions other than the Mandell method. Zenith would not be liable if others added the extra radiation shielding. Nothing would be taken from the public under this analysis. The public would still have access to channel expansion, unscrambling, remote control, and even suppression of direct pickup interference if such suppression were a necessary consequence of practicing the unpatented methods.

Neither do we see this reasoning conflicting with the legislative history of the statute. It appears that the major reason for enactment of § 271(c) was to establish a compromise between the doctrines of contributory infringement and patent misuse. This was accomplished by restricting liability for contributory infringement to non-staple goods. *See Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 213, 100 S.Ct. 2601, 2621–22, 65 L.Ed.2d 696, 206 U.S.P.Q. 385, 403 (1980). We believe Congress wished to ensure liability for sellers who took non-infringing staples and unnecessarily designed them also to infringe a patent.

2. *Would Design Changes Transform the Converters to Staples?*

■ Plaintiffs suggest two design changes which they claim would allow the

Zenith converters to practice all patented methods and not infringe the Mandell patent. First, plaintiffs contend a "simple" VHF antenna by-pass switch would accomplish this purpose by allowing subscribers to tune the over-the-air VHF channels with their television tuner, rather than the converters, when direct pickup interference was encountered. Plaintiffs contend that, using such a design, the converters could retain the ability to process VHF channels when there was no direct pickup interference (sup. Stern decl. at ¶¶ 26–27). Zenith contends that such a by-pass switch would deprive cable operators of the ability to descramble, address individually or remotely control the volume of the by-pass channels. Further, subscribers would not be able to use the converter's remote controller to tune all channels. Finally, Zenith argues that a VHF by-pass switch also would affect VHF channels that would not be subject to direct pickup interference and thus tuning these channels through the converters could never infringe the Mandell patent. We believe that Zenith has not addressed the point plaintiffs are trying to make—that the bypass would be used only when a subscriber encountered direct pickup interference.[10] All other functions would remain.

Even if we accept plaintiffs' arguments, we do not believe lack of a by-pass switch can, as a matter of law, result in Zenith's liability for contributory infringement. We must look at the product sold by Zenith, *see Hodosh*, 833 F.2d at 1577, 4 U.S.P.Q.2d at 1937, and Zenith does not sell converters with antenna by-pass switches. However, the fact that converters with such a by-pass switch could practice all the patented methods, yet not allow infringement of the Mandell patent, could be a factor in determining liability for actively inducing infringement. *See* sec. V–D *infra*.

The second alternative design suggested by plaintiffs would require cable operators to use head-end channel shifting where local VHF channels prone to direct pickup interference would be shifted by cable operators to vacant channels. Subscribers object to head-end shifting because of the loss of channel identification. For example, channel 2 might be broadcast over channel 3. Plaintiffs argue that Zenith could have designed its converters to have channel-mapping capabilities. Channel-mapping would have solved subscribers' channel identification concerns and avoided practice of the Mandell method (because of head-end shifting) (sup. Stern decl. ¶ 33). Zenith has not responded to plaintiffs' arguments.

For the same reasons stated above, we do not believe this alternate design impacts our inquiry into whether Zenith's converters are or are not staples. We will however consider this design question on the issue of active inducement to which we now turn.

**D. Active Inducement**

Active inducement to infringe is a separate action from contributory infringement, although the two may overlap. Contributory infringement is limited to selling non-staple articles while one can induce infringement by a variety of conduct, including by selling staple or non-staple products. *See Rohm & Haas v. Dawson Chem.*

**10.** This confusion on Zenith's part may stem from plaintiffs' failure to define clearly when a subscriber would use the VHF bypass. Plaintiffs imply that subscribers would use the bypass when those subscribers encountered direct pickup interference. However, if a subscriber in fact experienced direct pickup interference on her television she would not be infringing the Mandell patent. Perhaps plaintiffs are suggesting that the bypass would allow a subscriber to eliminate direct pickup interference without the need for additional (and thus infringing) shielding.

If, however, the shielding that prevents direct pickup interference is necessary to perform the non-infringing functions, *see* sec. V–C,1 *supra*, there seems to be no simple and direct method for subscribers to know when to use the by-pass. Would a subscriber be expected to use the bypass for over-the-air VHF channels only if she is within a certain distance from the transmitting tower (where direct pickup interference is a problem)? Or are plaintiffs suggesting that a converter with such a by-pass allows subscribers to view over-the-air VHF channels without infringing and thus a seller of such a device would not be liable for contributory or induced infringement? At trial, plaintiffs must clarify their theory.

*Co.*, 191 U.S.P.Q. 691, 700 (S.D.Tex.1976), *rev'd on other grounds*, 599 F.2d 685, 203 U.S.P.Q. 1 (5th Cir.1979), *aff'd*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696, 206 U.S.P.Q. 385 (1980). However, proof of intent to induce infringement is a requirement for liability under 35 U.S.C. § 271(b). *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668, 7 U.S.P.Q.2d 1097, 1103 (Fed.Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988).

■ In our earlier opinion we recognized that the same conduct could result in liability for either active inducement or contributory infringement. *See Oak*, 697 F.Supp. at 994, 9 U.S.P.Q.2d at 1143. However, if the product sold was a staple article, we could find liability only for active inducement not for contributory infringement. *See Calhoun*, 153 F.Supp. 301, 115 U.S.P.Q. at 126. Consequently, we must determine if a jury could find Zenith liable for actively inducing infringement if that jury found Zenith's converters to be staples.[11]

We think the important inquiry is whether Zenith possessed the requisite intent to be held liable for inducing infringement. To determine intent, we must look at Zenith's conduct. Plaintiffs present us with a series of actions from which they argue a jury could infer Zenith's intent to induce infringement. Plaintiffs argue that Zenith was aware of the problem of direct pickup

interference and the Mandell patent, prior to designing their converters; Zenith designed the converters to infringe the Mandell patent, by including extra shielding against electromagnetic radiation[12] (sup. Stern decl. at ¶¶ 10, 12); Zenith provided information to CATV operators that explicitly informed them that the converters could eliminate direct pickup interference (*see id.* at §§ 13–15; Willis decl. at ¶ 19); Zenith's field service engineers actively assisted CATV operators in setting up their systems, thus making these engineers aware of subscribers' infringing use of the converters (*see* instruction manual for the Z–TAC system, 3d ed., at 1–10); and Zenith could have provided a VHF antenna bypass switch or channel-mapping with the converters to eliminate the possibility of infringement (sup. Stern decl. at ¶¶ 26–27, 33).

■ Zenith first argues that as a matter of law liability for inducement is contingent on a finding of active solicitation. We do not believe this is a correct statement of law. We think that plaintiffs may prove Zenith's intent to induce infringement by showing a number of actions from which the trier of fact could infer such intent. *See Water Technologies*, 850 F.2d at 668–69, 7 U.S.P.Q.2d at 1103–04. *See also Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 411, 137 U.S.P.Q. 84, 87 (5th Cir.1963) (inducement "as broad as the range of actions

---

**11.** Although Zenith erroneously argued that this court earlier stated that Zenith could not be liable under 35 U.S.C. § 271(b) if Zenith's converters were staple articles, Zenith has briefed the issue of active inducement (Zenith's reply mem. at 12). In fact, Zenith argues that where a product is a staple article of commerce, a seller is liable only where that seller actually caused and actively solicited the buyer to use the product in an infringing manner. *Id.* at 14. However, Zenith then argues that we earlier stated that where a product is a staple, a seller "can only be liable for active inducement only if it tells its purchaser to use its products for infringing uses as opposed to non-infringing ones." *Id.* at 13. We did not so state. We only gave examples of what acts could constitute active inducement and which could not. Between the examples is a grey area which needs exploring based on the facts of each case. *Cf., Water Technologies*, 850 F.2d at 668, 7 U.S.P.Q.2d at 1104 (intent is factual determination).

**12.** We emphasize that all the points we discussed concerning the relationship of the shielding question to contributory infringement, *see* sec. V–C,1 *supra*, also apply to the issue of active inducement. Whether or not Zenith's converters are staples, a jury could find that Zenith actually induced infringement of the Mandell patent by adding extra shielding to the tuner and/or converter boxes to eliminate direct pickup interference. Of course, if the jury found that the shielding was necessary for the converters to perform the unpatented methods, then any infringement would be incidental to the performance of other functions. In such a case, Zenith would not be liable for contributory infringement on account of the shielding design. This is an example of how the factual issues relating to contributory infringement and active inducement merge and why an interlocutory appeal on the legal basis for contributory infringement is not appropriate. *See* sec. VII *infra*.

by which one in fact causes, or urges, or encourages, or aids another to infringe a patent"). Such circumstances may include giving a direct infringer instructions on how to use a patented process or designing a product to infringe. *Water Technologies*, 850 F.2d at 668, 7 U.S.P.Q.2d at 1103–04.

Zenith also argues that plaintiffs' "facts" do not amount to active inducement. Zenith contends that cable operators, not Zenith, made decisions as to whether to use head-end channel shifting and thus whether direct infringement by subscribers would be possible. Zenith further claims that plaintiffs have offered no evidence to show that Zenith assisted customers in this decision. Additionally, Zenith argues that there is no evidence that any cable subscribers relied on Zenith's printed material in deciding to use converters in an infringing manner. Finally, in arguing that it is not liable for contributory infringement, Zenith argues that the VHF by-pass switch could not allow subscribers the full range of options (*see* sec. V–C,2 *supra*), and that shielding was necessary to perform other non-infringing functions [13] (*see* sec. V–C,1 *supra*).

The determination of intent is a question of fact which should be decided by a jury. *See Water Technologies*, 850 F.2d at 668–69, 7 U.S.P.Q.2d at 1104. In this case we believe that after taking inferences in plaintiffs' favor, the jury could find that Zenith possessed the requisite intent to induce infringement. Consequently, plaintiffs have shown sufficient factual questions exist to avoid summary judgment. We note however that questions concerning an alternate channel-mapping converter appear to be irrelevant to any inquiry on inducing infringement. Zenith provided a product to be used by cable operators. Absent evidence—and none has been introduced—that Zenith actively encouraged these operators not to use head-end channel shifting, channel-mapping converters are a different product to be used on systems with head-end shifted channel systems. Such converters have no application to induced infringement in this case.

## VI. *Damages*

■ As an alternative to the argument that plaintiffs had not set forth competent evidence of direct infringement (*see* sec. V–B *supra*), Zenith moves for partial summary judgment limiting plaintiffs' recovery only to converters which plaintiffs have proved were used to infringe the Mandell patent. Plaintiffs argue that a reasonable royalty should be calculated on all units capable of infringing. We find no support in the patent statute or case law for plaintiffs' position and grant defendant's motion for partial summary judgment.

Section 284 of the patent statute states in part:

> [T]he court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty *for the use of the invention by the infringer* . . . .

35 U.S.C. § 284 (emphasis added). We believe that the statute supports Zenith's interpretation. Plaintiffs' interpretation would impose liability on Zenith for non-infringing use. Consequently, we cannot read the statute to support plaintiffs' interpretation. The parties have not cited, nor have we found a case directly on point. However, we note that in awarding damages courts will attempt to allocate damages to infringing items where there is evidence in the record to support such an apportionment. *See Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 798–99, 6 U.S.P.Q.2d 1878, 1880 (Fed.Cir.1988); *see also Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1578, 7 U.S.P.Q.2d 1606, 1615 (Fed.Cir.1988) (refusing apportionment under the facts of the case but stating in *dicta:* "Royalties are paid and payable on the use made of the invention, *i.e.*, on *infringing* products and *infringing* uses of the claimed process.") (emphasis in

---

**13.** Because of our earlier comments that the concept of active inducement merges with issues of contributory infringement, *see Oak*, 697 F.Supp. at 994, 9 U.S.P.Q.2d at 1143, we consider these arguments also as part of our analysis of the active inducement question.

original). We believe the same policy should be applied to this situation.

Plaintiffs argue that royalties in negotiated licenses were based on the number of converters capable of infringing, rather than on the number that would infringe, because of the difficulty in determining how many converters would infringe the Mandell method.[14] Plaintiffs claim that we should look to these earlier licenses for guidance to any damage award. Plaintiffs confuse the license terms, which are not binding on courts, *see Water Technologies Corp. v. Calco, Ltd.,* 714 F.Supp. 899, 904 n. 2, 11 U.S.P.Q.2d 1410, 1413 n. 2 (N.D.Ill. 1989), with the calculation of a reasonable royalty. These licenses may be evidence of a reasonable royalty but cannot substitute for evidence of the number of infringed converters. *See also Fromson,* 853 F.2d at 1575 n. 11, 7 U.S.P.Q.2d at 1611 n. 11 (courts have noted a need to distinguish royalties paid by non-infringers and by infringers). We do note, however, that because these negotiated licenses are based on the number of infringing capable converters, the royalty rate may not be applicable to a situation of calculating a reasonable royalty on infringing converters. Furthermore, Zenith must bear the burden of any uncertainty in the allocation between infringing and non-infringing converters. *See Nickson,* 847 F.2d at 799, 6 U.S.P.Q.2d at 1880.

### VII. *Interlocutory Appeal*

■ Zenith has requested certification to allow an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) of our interpretation of law of contributory infringement. Specifically, defendant takes issue with the standard that any infringing use be incidental to and necessary for the purpose of non-infringing methods. Zenith also contends that design changes not be considered as part of our analysis of contributory infringement.

Even if Zenith's arguments were to prevail, a trial still would be necessary on the

issues of induced infringement and damages. Much of the evidence which would be presented on the issue of contributory infringement would also be introduced to prove induced infringement (*e.g.,* design of tuner and converter shielding). Consequently, we deny this motion because we do not believe an interlocutory appeal will materially advance the ultimate termination of this litigation.

### CONCLUSION

For the reasons stated, we deny all motions, except defendant's alternative motion for partial summary judgment to limit damages to only those converters found to have infringed the Mandell patent.

---

**14.** Zenith disputes that all licenses were based on infringing capable converters and states that the license to Oak was based on the number of converters located within 7.5 miles of a transmitting tower (Zenith reply at 26 n. 4).